In re BENGAL TRADING CORPORATION, Debtor.

PRIME FINANCIAL SALES, Plaintiff,

v.

Herbert FREEHLING, Trustee of Bengal Trading Corporation, Defendant.

Bankruptcy No. 80–01471–BKC–JAG.
Adv. No. 81–0122–BKC–JAG–A.

United States Bankruptcy Court, S. D. Florida.

Oct. 5, 1981.

Carl Schmitt, Frank, Strelkow & Gay, North Bay Village, Fla., for plaintiff.

Paul G. Hyman, Jr., Britton, Cohen, Kaufman, Benson & Schantz, Miami, Fla., for trustee.

Herbert S. Freehling, Fort Lauderdale, Fla., Trustee.

Gerald Beyer, Beyer, Lerner & Puder-Harris, Fort Lauderdale, Fla., for debtor.

## FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

This case was tried on the Amended Adversary Complaint of Prime Financial Sales (Prime) (C.P. No. 28A) in which the plaintiff sought the return of $70,500 from the trustee.

The debtor, Bengal Trading Corporation (Bengal), was a commodities futures commission merchant. Bengal created a product known as a Futures Long Term Advisory Program (FLT) by which a customer could pay one advisory fee which would cover the commission and all costs of trading of one futures contract at a time, as often as the customer desired, within a one year period. Bengal executed the trades, but contracted with other business entities which acted as sales agents for the FLT s. Prime was one of several such agents.

On May 15, 1980, Bengal and Prime executed a contract under which they first entered into a business relationship (Plaintiff's Exhibit No. 2). Pursuant to that contract, Prime maintained its own offices and covered the expenses it incurred in making sales of the FLTs. At the time of purchase of an FLT, the customer would pay the initial margin costs for whatever futures contract he was then trading, plus an advisory fee of $1,800. Under the Bengal-Prime contract, the advisory fee was allocated as follows: $100 was a commission to Bengal, $1,400 was a commission to Prime, $200 was allocated to "Fund 1" and $100 was allocated to "Fund 2". Bengal was to receive $20 per round turn trade for each FLT customer trade executed by Bengal, and Fund 1 was created to be the source of funds for these payments to Bengal. Fund 2 was a legal contingency fund. It did not have a clearly defined purpose, but was to be available in case of difficulties.

At the time a customer purchased an FLT from Prime, the customer sent his money, including margin funds as well as the $1,800 advisory fee, to Bengal. Bengal maintained an interest bearing segregated customers' account as required by 7 U.S.C. § 6d. All customers' funds were permitted to be, and were, combined in the one account. Paul Clancey, president of Bengal, stated that the $1,800 on the sale of each FLT was "excess" and was permitted to be removed from the segregated account. At the time the contract was executed, the parties contemplated that the $1,400 portion would be transferred to Prime and be used in its regular operating account as gross income to it; that the $100 portion to Bengal would be treated similarly; and that separate bank accounts would be established for the deposit of Fund 1 and of Fund 2. Paul Clancey and Terry Ziegler, principals of Bengal and Prime respectively, did go to a bank with the intention of opening a bank account or accounts to be held by Bengal and Prime jointly for this purpose. However, the bank required certain business documents from Prime which were not available at that time and no bank account was ever opened.

As it turned out, of each $1,800 advisory fee received by Bengal, only the $1,400 commission portion to Prime was removed from the customers' segregated account. Paul Clancey explained that Prime needed those moneys to finance its operation, and there was no reason not to disburse them, so they were paid out of the account (via Bengal's operating account) on a regular basis. Since there was no specific account available for depositing the contents of Fund 1 and Fund 2, Clancey left those funds in the total segregated account and also left Bengal's $100 share until such time as a total disbursement could be made. However, Bengal's accounting records allocated the funds as described above.

The trustee does not dispute Prime's calculation of the *amount* due it, if the court should conclude that the funds are to be turned over to Prime. By taking the total number of sales times $300 (Fund 1 plus Fund 2), minus $20 for each of the 719 round turns processed by Bengal, Prime calculates that it is owed the balance of $77,420 from Fund 1 and Fund 2 moneys which were never disbursed to it.

On or about November 10, 1980, Paul Clancey learned that Bengal was not in compliance with the minimum financial requirements of the Commodity Futures Trading Commission (17 CFR § 1.17). As such it was required to cease doing business immediately and Clancey so instructed his personnel. Bengal's voluntary petition in bankruptcy was filed and an interim trustee was appointed on November 12, 1980. Because bankruptcy intervened there was no intermediate, much less ultimate accounting between Bengal and Prime as to Fund 1 and Fund 2 and the money remains in the segregated account which the trustee took control of.

Funds from the customers of other sales agents of Bengal were initially deposited in the same segregated customers' account as were the funds of the customers of Prime. At the time Bengal was required to cease trading, there were no advisory fees for non-Prime customers remaining in that

account, except possibly for some which were still being processed.

The trustee relies entirely on 11 U.S.C. § 766 as the basis for his retaining these funds. But § 766, as its title indicates, prescribes the treatment of "customer" property. Common sense would suggest that Prime was not a "customer" of Bengal, and the definition of "customer" in § 761(9)(A) supports common sense:

(9) "customer" means—

(A) if the debtor is a futures commission merchant—

(i) entity for or with whom the debtor deals and that holds a claim against the debtor on account of a commodity contract made, received, acquired, or held by or through the debtor in the ordinary course of the debtor's business as a futures commission merchant from or for the commodity futures account of such entity; or

(ii) entity that holds a claim against the debtor arising out of—

(I) the making, liquidation, or change in the value of a commodity contract of a kind specified in clause (i) of this subparagraph;

(II) a deposit or payment of cash, a security, or other property with the debtor for the purpose of making or margining such a commodity contract; or

(III) the making or taking of delivery on such a commodity contract;

All aspects of the definition eventually connect back to the phrase "the debtor's business as a futures commission merchant from or for the commodity futures account of such entity". The funds in question have nothing to do with any commodity futures account of *Prime* which Bengal was handling. Prime is not a customer of Bengal and as such, any claim or property of Prime would not be "customer property" under the definition of § 761(10) and would not be controlled by § 766 which requires that customer property be distributed ratably to customers under the terms specified.

The court finds that under the terms of the Prime-Bengal contract (although the drafting leaves something to be desired) the contents of Funds 1 and 2 were to become the property of Prime immediately upon payment by each customer of the $1,800 fee. The continued retention in the joint control of both Bengal and Prime was to assure availability of the funds for payment of the contingent obligations to Bengal. As such, Bengal was merely a conduit for Prime's funds, and continued to hold the funds in its account for reasons unrelated to the business of Bengal.

The trustee has not alleged that the retention of these funds in the customers' segregated account violated regulations of the Commodity Futures Trading Commission, or asserted any estoppel against Prime on such a basis. Therefore this court must conclude that the funds in question belong to Prime and should be returned to it.

Pursuant to B.R. 921(a), a separate Final Judgment incorporating these Findings and Conclusions is being entered this date.